Case 4:25-cv-04696   Document 23   Filed 02/20/26 in TXSD   Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
February 21, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| C. MERCADO, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-25-4696 |
| | § | |
| UNITED AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Cesar Mercado sues his former employer, United Airlines, Inc., alleging that he was written up, suspended without pay, and then pressured to resign because of his race and national origin. (Docket Entry No. 11). He asserts claims under Title VII and 42 U.S.C. § 1981 for race discrimination, national origin discrimination, and hostile work environment. (*Id.* ¶¶ 56–90). United moved to dismiss. (Docket Entry No. 13). At the initial conference held on January 15, 2026, the court granted the motion to dismiss as to the hostile work environment claims but stated that the motion remained pending as to the discrimination claims. (Docket Entry No. 19). Based on the pleadings, the motion, and the applicable law, the court denies the motion to dismiss the discrimination claims. The reasons are explained below.

**I.    Background**

Mercado is Hispanic and from Puerto Rico. (Docket Entry No. 11 ¶¶ 1, 17). His primary language is Spanish and his English is heavily accented. (*Id.* ¶ 17). He began working for United in New York in 2000, transferred to George Bush Intercontinental Airport (IAH) in 2016, and worked for United through 2025. (*Id.* ¶¶ 18, 19). Mercado joined United's "Move Team" in September 2019. (*Id.* ¶ 18). At that time, he was given a one-page "Personal Vehicle Parking

Policy," which told the Move Team members where to park during their shifts. (*Id.* ¶ 23). He was also given verbal instructions from team members on how to clock in and out for his shifts via a mobile app or at physical kiosks located in "various areas" at IAH. (*Id.* ¶ 24).

Mercado asserts that after the initial parking policy and verbal instructions were provided, the Move Team members' assigned parking was changed three different times to different areas and terminals of IAH and that these changes were only verbally communicated. (*Id.* ¶ 25). He asserts that it was "still understood that" members could clock in and out for shifts via the app or at the closest kiosk, "with no formal written policy stating designated clock in and out areas for Move Team members." (*Id.*). During COVID, however, the Move Team members were instructed to use a specific kiosk to clock in and out. (*Id.* ¶ 26). After the pandemic emergency protocols ended, the Move Team could again clock in and out using the app or at available kiosks throughout IAH. (*Id.* ¶ 27). Mercado asserts that if he had technical problems, he would contact Ricki Mendoza, his supervisor, for assistance.[1] (*Id.* ¶¶ 30, 28).

One day in June 2023, Mercado clocked out of his shift using the app, but it did not record the time he clocked out. (*Id.* ¶ 29). Pam Hernandez, one of Mercado's superiors, told Mendoza that she had to write Mercado up for not clocking out. (*Id.* ¶¶ 21, 29). When he learned of the write-up, Mercado contacted another supervisor to provide Hernandez with photographic evidence of when he arrived at work. (*Id.* ¶ 30). Despite the dated and time-stamped photos, Hernandez allegedly refused to remove the write-up from Mercado's file. (*Id.* ¶ 31). Mercado's union representative and Shop Steward, Tom Morgan, told him to file a written complaint with the human resources department against Hernandez. (*Id.* ¶ 32). The pleadings do not assert that Mercado

---

[1] Mercado asserts that none of his superiors (Pam Hernandez, Donnie Phares, and Robby Lafluer) nor his direct supervisor (Ricki Mendoza) were Hispanic or Puerto Rican. (Docket Entry No. 11 ¶¶ 20, 21).

ever filed such a complaint. Mercado alleges that after June 2023, whenever he experienced a technical issue, he would contact Mendoza and Hernandez, "yet he did not receive any further communication or instruction." (*Id.* ¶ 33).

On November 23, 2024, Mercado alleges that he entered IAH through the Mail House (presumably a part of IAH) and attempted to clock into the kiosk at 2:30 p.m., but it did not work. (*Id.* ¶ 34). He took a photograph of the time on the clock and his ID and sent the photos to Mendoza to prove that he was starting his shift on time. (*Id.*). He then used the app to clock in. (*Id.*). Mercado explained the issue to a coworker and Shop Steward, Jaime Enchautegui, who is also Puerto Rican. Enchautegui told Mercado that United employees can clock in at any kiosk at the airport and that he did not know why Mercado was having an issue doing so. (*Id.* ¶ 36). Mercado then called Mendoza, who told him—allegedly for the first time since he joined the Move Team—that the Mail House was not Mercado's designated entry area. Mendoza told Mercado to contact Hernandez about the clock-in issue. (*Id.* ¶ 37). Mercado called Hernandez, who told him that he was not allowed to clock in at the Mail House and that she would not correct the clock-in error. (*Id.* ¶¶ 38, 39). Mercado alleges that he felt "confused and targeted" by Hernandez's comments and her refusal to correct the misinformation, and that he was "still not provided with any verbal or written instruction on the alleged designated area where he was to clock in and out." (*Id.* ¶ 39).

On November 30, 2024, Mercado contacted a former supervisor, Robby Lafleur, to explain the November 23 incident and to ask for clarity on the clock in/clock out policy. (*Id.* ¶¶ 21, 40). Lafleur did not answer but forwarded the email to Hernandez and Donnie Phares, the Airport Operations Manager, asking for "[t]houghts on the below . . . I haven't answered him yet. . . ." (*Id.* ¶ 40). Mercado alleges that he did not hear from anyone about the November 23 incident or other time-clock issues again until February 2025. (*Id.* ¶ 41). Mercado alleges that over the "next couple

3

of months," he continued to ask his coworkers and other Move Team members about any new policy or instruction for clocking in and out, and no one said that they had been given any new instructions. (*Id.* ¶ 42).

On February 3, 2025, Mercado was called into a conference with Phares, Moran, Move Team Supervisor Abel Nora, and a human resources representative, Mary Buesing, as part of an internal investigation. (*Id.* ¶ 43). Buesing asked Mercado in rapid English about his clock-ins from more than a year earlier. (*Id.* ¶ 44). Mercado asked Nora, who is Hispanic, to help translate the questions, since he regularly communicated with Nora in Spanish, but Phares denied this request and allowed the meeting to proceed in English only. (*Id.*). Mercado alleges that he had difficulty responding to the questions and could not ask any clarifying questions, which led to him being "accused of making false statements and of timeclock fraud." (*Id.* ¶ 45). Mercado was placed on suspension without pay. (*Id.*). Phares proposed terminating his employment. (*Id.*).

Mercado alleges that United's lack of support during this meeting caused him to "feel isolated and discriminated against" and that he sought medical care for his mental health due to the "gravity of discrimination and harassment he was enduring." (*Id.* ¶¶ 48, 49). The day after the meeting, Buesing asked Mercado to submit a letter explaining the dates he entered through different areas of IAH to clock in for his shifts. (*Id.* ¶ 47). Mercado alleges that "[o]nce again, the English-Spanish language barrier put [him] in a disadvantageous position" that "enabled" United's "discriminatory targeting" of him as a Hispanic employee from Spanish-speaking Puerto Rico. (*Id.*). Mercado asserts that the only other Move Team member investigated for time-clock rule violations was Ryan Carreon, a Hispanic Mexican male coworker. (*Id.* ¶¶ 46, 49).

Mercado alleges that at some point during his suspension, Carreon told Mercado that he had been suspended for suspected time-clock fraud and that supervisors had recommend firing

4

him.  (*Id.* ¶ 50).  Carreon's last day of work was on March 15, 2025, and United formally terminated him on August 19, 2025.  (*Id.*).  United did not investigate the time-clock practices of other Move Team members, although according to Mercado, they "were continuing to clock in and out from the mobile application or nearest kiosk."  (*Id.*).

Mercado alleges that he was pressured to resign.  (*Id.* ¶ 51).  On April 2, 2025, Mercado received a letter informing him of an Investigative Review Meeting scheduled for April 10, 2025.  (*Id.* ¶ 52).  The letter cited "proposed termination" as the reason for the meeting.  (*Id.*).  The letter stated that a company investigation had substantiated that between January 2024 and November 2024, Mercado clocked in at least 26 times at kiosks located in buildings other than his designated work area to "falsely give the impression" that he had arrived at work on time.  (*Id.*).  Mercado was told (although he does not specify by whom) that "his only option would be retirement by resignation because United Airlines does not forgive these kinds of situations and always fires employees accused of such matters."  (*Id.* ¶ 53).  Mercado alleges that he "was compelled" to resign on April 3, 2025.  (*Id.* ¶ 54).

In October 2025, Mercado sued United.  (Docket Entry No. 1).  In his amended complaint, (Docket Entry No. 11), which is the operative complaint, Mercado asserts claims for (1) race discrimination, national origin discrimination, and hostile work environment under Title VII and (2) race discrimination, national origin discrimination, and hostile work environment under 42 U.S.C. § 1981.  (*Id.* ¶¶ 56–90).  United moved to dismiss. (Docket Entry No. 13).  The court granted the motion to dismiss as to the hostile work environment claims at the initial conference and now addresses the remaining claims.[2]

---

[2] Mercado asserts that the motion to dismiss is time-barred because United filed its motion to dismiss and answer on the same day.  (Docket Entry No. 15 at 2).  But "courts often consider a post-answer motion to

## II.     The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the

---

dismiss as properly before the court as long as the movant also raised the defense . . . in his or her answer." *Natour v. Bank of Am., N.A.*, No. 4:21-CV-00331, 2021 WL 5239592, at *5 (E.D. Tex. Nov. 10, 2021) (alteration in original) (quoting *Isbell v. DM Records, Inc.*, No. 4:07-cv-00146, 2011 WL 1299611, at *2 n.2 (E.D. Tex. Mar. 31, 2011)). Because United raised the defense of failure to state a claim in its answer, (Docket Entry No. 12 ¶ 92), which was filed the same day as the motion to dismiss, the motion to dismiss was timely. *Natour*, 2021 WL 5239592, at *5. The court need not consider United's evidence that it submitted those two docket entries simultaneously. (Docket Entry No, 16-1).

6

parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quotation marks omitted, alterations adopted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## III.     Analysis

"The Title VII inquiry is 'whether the defendant intentionally discriminated against the plaintiff.'"[3] *Johnson v. Louisiana*, 351 F.3d 616, 621 (5th Cir. 2003) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). "Resolution of a claim involves a three-step, burden-shifting analysis." *Id.* "First, a plaintiff must raise a genuine issue of material fact on each element of his prima facie case. Second, if the plaintiff presents a prima facie case, the defendant must then give a legitimate, nondiscriminatory reason for the employment decision. Third, the plaintiff must raise a genuine issue of material fact that shows the defendant's reason may be pretext for discrimination." *Id*. "To establish a *prima facie* case of racial discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were

---

[3] "[R]ace discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII." *Sanders v. Fed. Express*, No. 4:24-cv-00333, 2025 WL 898070, at *7 (N.D. Tex. Mar. 4, 2025) (alteration in original) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004)). "[T]he analysis under both [Title VII] and § 1981 [is] identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies." *Id.* (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)). United disputes that Mercado exhausted his administrative remedies in its answer, (Docket Entry No. 12 ¶ 14), but does not raise the issue of exhaustion in its motion to dismiss, (*see generally* Docket Entry No. 13).

other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). The same test applies for national origin discrimination claims. *See Pita Santos v. Evergreen All. Golf Ltd., LP*, 650 F. Supp. 2d 604, 609 (S.D. Tex. 2009).

United does not challenge the first two prima facie elements and does not distinguish between the national origin and racial discrimination claims. It bases the motion to dismiss on the argument that "Mercado has failed to plead sufficient facts to support the third and fourth elements." (Docket Entry No. 13 ¶ 9). As to the third element, United argues that Mercado failed to sufficiently allege a constructive discharge because he failed to "allege either discrimination with aggravating factors or harassment beyond a hostile work environment," and that without alleging constructive discharge, he has failed to plead an adverse employment action. (*Id.* ¶ 10). As to the fourth element, United argues that Mercado failed to "identify a specific comparator—meaning someone with a comparable number of instances of timeclock fraud—*outside* his protected class in order to state a claim." (*Id.* ¶ 11). In response, Mercado argues that: (1) constructive discharge can be shown by an employer's adverse actions acts against an employee, whether or not those actions constitute "harassment" in the traditional sense; (2) suspension without pay is an adverse employment action; and (3) there was no need for him to name a specific comparator because no other employees besides himself and Carreon were even investigated for time-clock fraud. (Docket Entry No. 15).

Mercado's suspension without pay qualifies as an adverse employment action, regardless of the parties' dispute about constructive discharge. The Fifth Circuit recently clarified the definition of "adverse employment action," using the en banc process to eliminate its prior "ultimate employment decision" standard. *Hamilton v. Dallas County*, 79 F.4th 494, 506 (5th Cir.

8

2023). "A plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions, or privileges of employment.'" *Id.* (quoting 42 U.S.C. § 2000e-2(a)(1)). In *Hamilton*, the Fifth Circuit held that an allegation that a sheriff's department required female but not male officers to work full weekends was sufficient to state a sex discrimination claim. *Id.* at 505–06. Although this scheduling policy was not an "ultimate employment decision," it affected the "terms, conditions, or privileges" of employment. *Id.* In the retaliation context, the Fifth Circuit has held that even a two-day suspension without pay can be an adverse employment action. *See, e.g.*, *LeMaire v. La. Dep't of Trans. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007). Mercado's allegation of his months-long suspension without pay clearly affected the "terms, conditions, or privileges" of his employment and meets the adverse employment action requirement.

Mercado has also sufficiently alleged that he was treated differently because of his protected status. Mercado is correct that under Fifth Circuit case law, an employee need not necessarily show "each prong of the prima facie test for disparate treatment at the pleading stage," *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013), and that "scrutinizing whether [the employees'] fellow employees [are] really 'similarly situated'" is "more suited to the summary judgment phase," *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019). Mercado had to plausibly plead the "ultimate elements" of a disparate treatment claim under Title VII. *Id.* at 766–767. These elements are "(1) an 'adverse employment action,' (2) taken against a plaintiff '*because of* her protected status.'" *Id.* at 767 (quoting *Raj*, 714 F.3d at 331). The second element may be met by pleading facts showing that an employer treated similarly situated employees of other races or national origins more favorably. *Raj*, 714 F.3d at 331.

9

United frames the issue as whether Mercado's non-Hispanic coworkers "remained employed after double-digit instances of timeclock fraud." (Docket Entry No. 13 ¶ 11). This is too narrow. The issue is whether Mercado's non-Hispanic coworkers were not only suspended without pay or fired but investigated for time-card fraud after clocking in via the app or at any available kiosk at IAH, rather than at a designated kiosk. The investigation and suspension are necessarily coupled. The adverse employment action was only possible because Mercado was investigated, and that investigation allegedly happened because of his race or national origin. Although not a model of clarity, Mercado's complaint alleges that (1) other Move Team members clocked in and out via the app or at the nearest available kiosk but were not investigated, and (2) the only Move Team members who were investigated, and then had adverse employment actions taken against them, were the two Hispanic members of the team. (Docket Entry No. 11 ¶¶ 50, 62).

Whether the non-Hispanic Move Team members who were not investigated and therefore could not have been suspended for identical activities were sufficiently similarly situated is an issue more appropriate for adjudication at summary judgment. *See Davis v. CenterPoint Energy, Inc.*, No. 4:24-cv-1019, 2025 WL 816245, at *3 (S.D. Tex. Mar. 13, 2025) (allowing a complaint that was "by no means *overly* specific" to proceed when the plaintiff alleged that an employee named "Amanda," who was of a different race, received a warning for the same conduct that led to the plaintiff's removal and that the plaintiff was replaced by someone of a different race); *Lucenio v. Houston Indep. Sch. Dist.*, No. 4:21-cv-00650, 2022 WL 658838, at *15 (S.D. Tex. Feb. 16, 2022) ("[S]crutinizing whether [the plaintiff's] white co-workers were truly 'similarly situated' to her is more suited for the summary judgment phase."), *report and recommendation adopted*, 2022 WL 658719 (S.D. Tex. Mar. 4, 2022); c*f. Thornton v. Univ. of Tex. Sw. Med. Ctr. Sch. of Med.*, No. 24-10594, 2025 WL 619166, at *3 n.4 (5th Cir. 2025) (affirming a dismissal

10

based on the lack of comparators when the plaintiff pleaded that "[u]nder the same or similar circumstances, non-African American employees in his department have been allowed to return to work after presenting a 'fitness-to-return notice'" but failed to allege that those employees shared the same job title, supervisor, and also failed to return to work after their allotted medical leave).

## IV. Conclusion

The court denies the motion to dismiss as to the remaining discrimination claims. (Docket Entry No. 13). These claims will proceed.

SIGNED on February 20, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge